J. Tayler Fox (12092)
Madeline Aller (16770)
DURHAM JONES & PINEGAR
111 S. Main Street, Suite 2400
P.O. Box 4050
Salt Lake City, Utah 84110-4050
Telephone: 801-415-3000
Facsimile: 801-415-3500
tfox@djplaw.com
maller@djplaw.com
*Attorneys for Plaintiffs*

Derek G. Howard (Cal. Bar. No. 118082; *pro hac vice* pending)
DEREK G. HOWARD LAW FIRM, INC.
42 Miller Avenue
Mill Valley, CA 94941
Tel. (415) 432-7192
derek@derekhowardlaw.com

*Attorneys for Plaintiff Kacey Bingham*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, SOUTHERN REGION

| | |
|---|---|
| KACEY A. BINGHAM, <br><br> Plaintiffs, <br> v. <br><br> DIXIE STATE UNIVERSITY; MAUREEN ECKROTH, in her official and individual capacities; RICK SMITH, an individual; JASON BOOTHE, in his official and individual capacities; and DOAJO HICKS; JOYCE R. FIRESTACK; J.R. FIRESTACK & ASSOCIATES LEARNING CENTER (dba FIRESTACK CONSULTING, LLC), <br><br> Defendants. | **COMPLAINT** <br><br> **(JURY DEMAND)** <br><br> Case No. <br><br> Judge |

SLC_845943.5

Plaintiff Kacey Bingham ("Bingham" or "Plaintiff"), by and through her counsel of record, complains against Defendants as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Kacey Bingham ("Plaintiff") is a resident of the State of Oregon.

2. Defendant Dixie State University (herein "DSU" or "Dixie State") is a Utah state-run educational institution located in St. George, Utah.

3. Defendant Jason Boothe is an individual residing in the State of Utah and at all relevant times was employed as the athletic director at DSU.

4. Defendant Maureen Eckroth is an individual residing in the State of Utah and at all relevant times was employed as the associate athletic director and compliance officer at DSU.

5. Defendant Doajo Hicks is an individual residing in the State of Utah and at all relevant times was employed by as general counsel for DSU.

6. On information and belief, Defendant Rick Smith is a resident of New Hampshire.

7. Defendant Joyce R. Firestack is an individual residing in the State of Utah.

8. On information and belief, Defendant J.R. Firestack & Associates Learning Center (dba Firestack Consulting, LLC), is a Utah limited liability company with its principal place of business in St. George, Utah.

9. Bingham has exhausted administrative remedies, having filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the EEOC having issued a "right to sue" letter on February 19, 2019.  A copy of the letter is attached hereto as **Exhibit A**.

10. This Court has diversity jurisdiction under 28 U.S.C. §1332 because the matter in controversy: (a) exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs; and (b) is between citizens of different states resulting in complete diversity.

11. This Court also has original jurisdiction pursuant 28 U.S.C. §§ 1331 over the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) ("Title VII"), from claims arising from the actions of Defendant in violation of Title VII.

12. This Court also has jurisdiction under the Civil Rights Act of 1870, 42 U.S.C. § 1983.

13. The allegedly unlawful employment practices were committed in St. George, Utah and elsewhere in the State of Utah, which is within the jurisdiction of the U.S. District Court for the District of Utah, Southern Division. Accordingly, venue is proper pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391.

14. At all times relevant to this Complaint, Bingham was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f).

15. At all times relevant to this Complaint, Defendant DSU was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

16. At all relevant times, DSU employed more than fifteen employees in the State of Utah.

## FACTUAL ALLEGATIONS

17. During her employment with DSU, Bingham was subject to sexual harassment, discrimination and retaliation in violation of Title VII and Section 1983 of the

Civil Rights Act.

18. Following Plaintiff's firing from DSU, Defendants Boothe, Eckroth and others defamed Plaintiff to potential and current employers.

19. Plaintiff Bingham is female.

20. Plaintiff is also a member of the Church of Jesus Christ of Latter-day Saints ("LDS" or "LDS Church").

21. On information and belief, at the time of her hiring, DSU and Boothe did not know that she was a member of the LDS Church.

22. From January 2013 through December 2017, Plaintiff Kacey Bingham was employed by DSU as the head coach of the women's soccer team, the DSU Trailblazers.

23. Bingham entered into a written contract with DSU at the beginning of her employment. Until this dispute arose, the contract was renewed annually, with pay increases.

**Plaintiff Was a Successful Coach at DSU**

24. While at DSU, Bingham was one of the most successful female soccer coaches in NCAA Division II play. Bingham compiled a 33-16-1 record in the PacWest over her first four years at DSU.

25. Bingham led Dixie State to a 39-27-3 overall record.

26. In 2016, Bingham guided the Trailblazers to an 11-7-0 overall record, a second place finish in the conference, and victories in nine of the Trailblazers' final eleven matches.

27. Bingham led the Trailblazers to three-straight seasons of 10 wins or more.

28. During Bingham's tenure at DSU, twenty-one of her players earned all-Pacific West Conference honors, including two conference players of the year, and Defender of the

4

Year, along with four first-team and four second-team selections.

29. In 2017, DSU also produced two All American players under Bingham.

30. The team broke eight school records under Bingham.

31. In addition, two of Bingham's players have gone on to earn both National Soccer Coaches Association (NSCAA) and D2CCA all-West Region honors.

32. At the time Bingham lost her job in late 2017, she was the only coach at Dixie State University with an all-female coaching staff.

**Plaintiff Was a Successful Coach Prior to her Hiring at DSU**

33. Before becoming a coach, Bingham played NCAA soccer at the highest levels, playing for Arizona State University.

34. Bingham later served as an assistant coach at Paradise Valley Community College ("PVCC") in Arizona from 2004-2005, before taking over as head coach in 2006.

35. Bingham achieved a 125-14-8 overall record as the head coach of PVCC's women's soccer program, including a 23-0-1 record that resulted in the team playing in the 2012 NJCAA National Championship.

36. For this and other accomplishments, Bingham was heralded as one of the youngest and best woman soccer coaches in the nation.

37. Bingham also coached at Pinnacle High School ("PHS") in Arizona, where she led the women's soccer team to a 2011 state championship with a perfect record of 21-0.

38. Bingham was named 2011 AIA Region Coach of the Year and AIA Arizona Big Schools Coach of the Year.

39. Bingham achieved a 50-8-2 overall record at PHS.

5

40. Bingham also coached for the top soccer club in Arizona, SC Del Sol.

**The 2017 Season and the Captains' Exercise of the Right to Conduct Captains' Practices Sanctioned by the NCAA**

41. It is customary and permissible under NCAA Rules for players to organize and conduct voluntary "Captains' Practices" without the involvement of coaches.

42. Captains' Practices are a regular part of all athletic culture at DSU, including in the men's soccer, football and basketball programs.

43. Captains' Practices help integrate new incoming freshman, create social bonds, and get players in shape for the upcoming season.

44. In 2017, the Trailblazer's two returning team captains reserved field time beginning on July 5, 2017, and ran Captains' Practices prior to the regular season which started in mid-August.

45. The practices took place on campus, in front of the administrative offices and in full view of Defendants.

46. Bingham did not participate in or conduct the Captains' Practices.

47. Bingham did not mandate that players attend Captains' Practices.

48. This is confirmed by the fact that, during much of the summer of 2017, Plaintiff and her all-female staff were frequently not in the St. George area, or in Utah, while these practices were occurring, nor were they communicating with players or with each other during this period.

**The "Anonymous" Email from Defendant Mike Smith**

49. In July 2017, a purportedly "anonymous email" was sent to Defendant Eckroth,

the Compliance Director and assistant Athletic Director, accusing Bingham of running summer practices and suggesting that she be sanctioned.

50. On information and belief, the email came from Mike Smith, who was previously involved with the DSU men's athletic department, and may have been employed or providing services to DSU at the time.

51. The accusations in the email were false.

52. Defendant Eckroth never followed up with Mike Smith directly about his accusations, but instead took them at face value.

53. When Eckroth approached Plaintiff about these claims, Plaintiff denied, both verbally and in writing, that she had any involvement with the Captains' Practices.

54. The team captains also confirmed to Eckroth that Plaintiff had no involvement in the Captains' Practices.

55. Plaintiff was later reassured by DSU, Eckroth, and Boothe that the allegations about summer practices were without merit.

56. Defendant Boothe told Plaintiff that, although he did not believe any NCAA violation occurred, it would be best for Plaintiff to sign a document agreeing that the Captains' Practices had not been run in the correct manner to quickly resolve the matter.

57. Based on this assurance from Defendant Boothe, Plaintiff chose not to fight the claims and accepted a minor violation that resulted in the weight training facilities being closed to the Trailblazers for one week during August 2017.

58. Bingham was led to believe that this minor sanction officially resolved the matter entirely prior to the beginning of the 2017-2018 season.

### The Second Investigation into the Same Captains' Practices

59. However, in November 2017, Defendant Eckroth renewed an investigation about the very same Captains' Practices.

60. The purported reason for re-opening the investigation arose from complaints from a player named Gina Tedrow.

61. Ms. Tedrow told the Captains that she was going to get Bingham in trouble as revenge for not receiving more playing time.

62. Ms. Tedrow sent text messages to Defendant Eckroth alleging that Plaintiff had been secretly threatening the captains to hold Captains' Practices.

63. However, the two team captains denied Ms. Tedrow's claims and repeated to Defendant Eckroth and others that Bingham had not mandated the Captains' Practices.

64. Regardless, in November 2017, DSU retained Joyce Firestack as an "independent investigator" to investigate the issue of the Captains' Practices that had purportedly been resolved three months earlier.

65. By so doing, Defendants sought to punish Plaintiff twice for the same conduct.

66. Between November and December 2017, Firestack interrogated members of the women's soccer team, including players who were disgruntled because they were not seeing playing time.

67. Once more, the team captains told Firestack that Plaintiff had nothing to do with the Captains' Practices.

68. Firestack sought to intimidate and threaten players with discipline if they denied Tedrow's allegations.

69. Firestack told those players they would be subject to a failure to graduate on time, unless the players signed statements saying that Plaintiff had been secretly organizing and supervising Captains' Practices.

70. Firestack also intentionally disregarded a half-dozen text messages from Plaintiff showing that she was not involved in practices, as well as messages showing that Plaintiff made clear that Captains' Practices were not mandatory or sponsored in any way by the coaching staff.

71. On information and belief, Firestack never interviewed or attempted to reach Rick Smith about the accusations in his July 2017 Email.

72. Firestack's own notes of her investigation confirm that no NCAA or DSU athletic department violations occurred.

73. Firestack also accused Bingham of being dishonest in her interviews, which is false.

74. Firestack had no background in or specialty in college athletics, and was unaware of how Captains' Practices are organized and run.

75. During Firestack's investigation, Plaintiff was placed on administrative leave without warning.

76. On December 4, 2017, DSU refused to renew Plaintiff's employment contract and terminated her as head coach of the Trailblazers.

77. On December 21, 2017, DSU self-reported Bingham's purported violations to the NCAA using false findings and conclusions contained in Firestack's report.

78. Defendants Boothe and Hicks approved the false report to the NCAA.

79. The NCAA report incorrectly stated that Bingham mandated and was involved with the Captains' Practices and pressured her players to participate.

80. Plaintiff was never afforded an opportunity to address these statements to the NCAA.

**DSU Discriminated and Retaliated Against Plaintiff**

81. DSU's investigation and reporting of purported violations to the NCAA were pretexts for firing Bingham.

82. Bingham was actually fired based on religious and sex discrimination, and as an act of retaliation.

83. Defendant Boothe stated to third parties, including former coach Linda Huddleston, that he wanted to rid the DSU Athletic Department of LDS coaches.

84. Boothe is not a member of the LDS Church.

85. DSU also treated Bingham disparately from male coaches in other athletic programs.

86. In 2016, the DSU men's soccer and football teams engaged in the very same conduct that the Plaintiff was alleged to have carried out, *i.e. overseeing and supervising Captains' Practices, and/or pressuring players to attend,* yet DSU did not report the men's coaches or the men's basketball program to the NCAA for such purported violations.

87. During this period, the men's basketball team also committed severe NCAA violations than Bingham, including by illegally providing discounted housing to the players, but were not disciplined or retaliated against like Bingham experienced.

88. Defendant Boothe also annually cut the Women's Soccer budget without notice and without any explanation, even when Bingham questioned him.

89. On information and belief, Boothe intended to funnel (and may have) extra money to the men's football team under the pretense of additional travel expenses.

90. When Plaintiff complained about her disparate treatment, DSU employees retaliated against her, including by wrongly investigating and later firing her.

91. DSU's pattern of discrimination was confirmed when Defendant Boothe replaced Bingham with an out-of-state, non-LDS, male coach.

92. DSU also created and perpetuated a hostile working environment.

93. In spring 2013, Plaintiff complained that Boothe was taking money from the Women's Soccer budget. Boothe became irate with her in response.

94. DSU and Boothe also failed to take action when Bingham reported various incidents of harassment from the Men's Soccer coach, Johnny Broadhead ("Broadhead").

95. Broadhead frequently disrupted the practice times of the women's team, including by entering the field during women's practices, or not surrendering the fields at previously scheduled times.

96. Broadhead also frequently complained to DSU's athletic department that the Men's Soccer team should receive field preference because the male team was of more value to the university.

97. Broadhead frequently arrived unannounced to meetings of the Women's Soccer team to interfere with Bingham's planning and management of her team.

98. Broadhead often approached the Bingham's staff and players without Bingham's knowledge in attempts to undermine Bingham and improperly gain insight into the inner workings of the Women's Soccer team.

99. Broadhead also refused to contribute to gas and food expenses on joint recruiting trips, which was a violation of DSU policy and practices.

100. Broadhead also underhandedly tried to hire Bingham's assistant coaches to work for him in a local female club soccer program that he and Bingham both coached at on the side, and for which Broadhead saw Bingham as his competition.

101. DSU never took action against Broadhead for such behavior.

102. Instead, DSU retaliated against Bingham by wrongly investigating and firing her.

103. Additionally, in 2017 Bingham reported Boothe to the Title IX office for making sexually inappropriate comments directed at Bingham while meeting to discuss hiring a new coach for the men's soccer team.

104. Shortly after Bingham's report, DSU and Boothe retaliated against Bingham and her contract with DSU was not renewed.

105. Moreover, in 2016, Bingham complained that Boothe's efforts to change conferences from the PacWest to the lower RMAC conference was to benefit the men's football program at the expense of other programs, including the successful women's soccer program.

106. A majority of the faculty, athletes, and female coaches at DSU opposed Boothe's attempts to change conferences.

107. Bingham and other female coaches also complained that if the conference

change occurred, it would negatively impact their efforts to attract and recruit regional female athletes.

108.    Bingham also insisted that her team's budget not be reduced or otherwise negatively impacted by travel to RMAC schools if the school changed conferences, given DSU's attempts to re-route her program's money to men's sports by disguising it as travel expenses.

109.    Because of Bingham's insistence on protecting her team and program, Boothe and DSU retaliated against Plaintiff by wrongfully investigating and later firing her on December 4, 2017 without any warning.

110.    While looking for new employment, Plaintiff learned that DSU, through Defendants Hicks and Boothe, made defaming comments about her, including that potential employers should not hire her.

111.    They also falsely told potential employers that Bingham had forced players to attend the pre-season Captains' Practices.

112.    Additionally, they falsely told potential employers and Bingham's own players at DSU (whom Bingham had recruited and nurtured into a winning team) that she had been terminated for "NCAA violations," which was false.

113.    These statements have harmed Bingham's reputation, and have caused her financial and emotional harm.

## FIRST CAUSE OF ACTION
**(Sex and Religious Discrimination and Hostile Work Environment in Violation of Title VII against DSU)**

114. Plaintiff realleges and incorporates by reference each of the allegations in the preceding paragraphs of the Complaint as though fully set forth here.

115. Title VII of the Civil Rights Act of 1964, (Title VII 28 U.S.C. §2000e *et. seq.*) as amended, prohibits discrimination by an employer against an employee because of the employee's sex or religion.

116. The adverse employment actions taken against Bingham, including failing to continue to employ Bingham, and causing her termination of employment, were motivated by Bingham's sex and religion.

117. Defendant Dixie State's actions have directly and proximately caused Bingham substantial past and future economic loss, including lost wages, damage to her career, humiliation and pain and suffering, in an amount to be determined at trial.

118. Defendant Dixie State's unlawful conduct toward Bingham in violation of Title VII was done with reckless disregard for her federally protected rights, such that it should be subject to an award of punitive damages.

119. Bingham is also entitled to her reasonable expenses and attorneys' fees pursuant to Title VII.

**SECOND CAUSE OF ACTION**
**(Violation of Title IX, 20 U.S.C. §§ 1681–1688, Against Defendant DSU)**

120. Plaintiff realleges and incorporates by reference each of the allegations in the preceding paragraphs of the Complaint as though fully set forth here.

121. Title IX provides that "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

122. Defendant Dixie State received federal financial assistance and is an education program under Title IX.

123. As alleged more fully above, Bingham was subject to sexual harassment and by the intentional conduct of Boothe, Broadhead, and others, and subjected to additional harassment following her complaints.

124. Boothe, Hicks, Eckroth, and, on information and belief, other DSU officials with authority to institute corrective measures had actual notice that DSU employees posed a substantial risk of sexual harassment to Bingham.

125. Dixie State University and its officials with authority to institute corrective measures were deliberately indifferent to the sexual harassment of Bingham by DSU employees.

126. DSU's responses to the harassment were clearly unreasonable in light of the known circumstances.

127. DSU's deliberate indifference to known acts of harassment, discrimination and retaliation, caused Bingham to suffer damages.

128. As a direct and proximate result of Defendant Dixie State's unlawful actions, Bingham has suffered damages and is entitled to recover damages, both economic and non-economic, including loss of wages and benefits, future pecuniary losses, loss of reputation in her profession, emotional distress and other damages as allowed by law as established by proof at trial.

129. Bingham is also entitled, under 42 U.S.C. § 1988, to recover attorneys' fees and costs incurred in prosecuting this action.

### THIRD CLAIM FOR RELIEF
**(Slander and Defamation Against All Defendants)**

130. Plaintiff realleges and incorporates by reference each of the allegations in the preceding paragraphs of the Complaint as though fully set forth here.

131. DSU self-reported false facts and findings from the Firestack investigation regarding the Trailblazer's Captains' Practices to the NCAA.

132. Defendants knew the facts and findings they reported to the NCAA were false.

133. Defendants were also negligent in regards to the truth or falsity of the facts and findings they reported to the NCAA.

134. Defendants also falsely told Plaintiff's potential and current employers that Plaintiff had conducted Captains' Practices in violation of the NCAA.

135. Defendants knew the statements they made concerning Plaintiff and the Captains' Practices to her potential and current employers were false.

136. Defendants were also negligent in making the false statements concerning Plaintiff and the Captains' Practices to her potential and current employers.

137. Plaintiff has had difficulty finding comparable employment due to the false investigation, statements and NCAA report.

138. Bingham is entitled to recover damages in an amount to be proved at trial, together with punitive damages, expenses and attorney's fees, and such other relief as may be available under the law, as established by proof at trial.

## FOURTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress Against All Defendants)**

139. Plaintiff realleges and incorporates by reference each of the allegations in the preceding paragraphs of the Complaint as though fully set forth here.

140. In subjecting Bingham to sexual harassment, Defendants intentionally and recklessly engaged in intolerable and outrageous conduct that caused Bingham severe emotional distress.

141. Defendants approved and directly caused the Firestack investigation to reach its result and caused the ensuing NCAA report to be published and circulated throughout the soccer community, and wrongly fired Bingham.

142. Any reasonable person would have known that taking such action would cause severe emotion distress.

143. As a result of such outrageous conduct, Bingham has suffered and continues to suffer emotional distress.

144. The conduct described herein was willful and malicious and manifested a knowing and reckless indifference toward, and in disregard of, Bingham's interests and rights.

145. As a direct and proximate result of the intentional infliction of emotional distress, Bingham has suffered general and specific damages, as well as loss of reputation.

146. Bingham is entitled to recover damages in an amount to be proved at trial, together with punitive damages, expenses and attorney's fees, and such other relief as may be available under the law, as established by proof at trial.

## **JURY DEMAND**

Bingham hereby requests a trial by jury on all claims and causes of action so triable under Fed. R. Civ. P. 38.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays relief against Defendants as follows:

a.  For judgment in Bingham's favor and against Defendants for all causes of action asserted herein;

b.  For all wages, compensation and other economic benefits lost as a result of

c.  For all special and general damages available to Plaintiff, including pecuniary and non-pecuniary losses;

d.  For an award of attorneys' fees, costs and expenses as allowed by the foregoing claims;

e.  For an award of punitive damages;

f.  For prejudgment and post-judgment interest as allowed by law; and

g.  For any and all other relief the Court deems just and proper.

Dated:  May 14, 2019.

**DURHAM JONES & PINEGAR**

*/s/ J. Tayler Fox*
J. Tayler Fox
Madeline Aller

**DEREK G. HOWARD LAW FIRM, INC**

Derek G. Howard
*Attorneys for Plaintiff*